## Rossi v United Cerebral Palsy of N.Y. City, Inc.

2025 NY Slip Op 31026(U)

March 25, 2025

Supreme Court, Kings County

Docket Number: Index No. 503039/2021

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

At an IAS Term, Part 15 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 25th day of March 2025.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
---------------------------------------------------------------------------X
ADELINA ROSSI, as Administrator of the Estate of LUIGI PETROCELLI,

      Plaintiff,

  -against-


UNITED CEREBRAL PALSY OF NEW YORK CITY, INC. d/b/a ADAPT COMMUNITY NETWORK,

     Defendant.
---------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 503039/2021
Mo. Seq. 2

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

<u>NYSCEF #s:</u>  53 – 55, 56 – 71, 73 – 75, 76 – 96, 97

Defendant United Cerebral Palsy of New York City, Inc. d/b/a Adapt Community Network ("Adapt") moves (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all medical malpractice claims against them in this action, or pursuant to CPLR 3212 (e), granting partial summary judgment as to individual claims of malpractice.

Plaintiff commenced this action, as administrator of the Decedent's estate, on February 8, 2021, asserting claims of negligence, medical malpractice, and wrongful death. With respect to the medical malpractice cause of action, Plaintiff alleges that Defendant failed to provide proper medical care and treatment to Decedent after he sustained a fall on October 4, 2018.

At the time of the events at issue, Decedent was 56 years old and resided at an Adapt group home. He had life-long developmental and intellectual disabilities including cerebral palsy, Treacher-Collins Syndrome, and prenatal underdevelopment of his head and neck. His care at Adapt was rendered by professional nurse practitioners, skilled nurses, speech language pathologists, nutritionists, and other support staff.

1

[* 1]

In April 2013, Decedent was diagnosed with oropharyngeal dysphagia, a condition that impaired his ability to swallow. At that time, his family did not consent to placement of a percutaneous endoscopic gastrostomy (PEG) tube and instead opted for an oral puree diet and honey-thickened liquids. He tolerated this diet generally well from 2013—2018, but he was briefly hospitalized in May 2016 and July 2018 due to choking episodes while eating.

On October 4, 2018, Decedent sustained a fall while being transferred from his bed to a shower chair at the Adapt group home. He was transported to Brookdale Hospital emergency department and underwent a CT scan of the head and cervical spine. He was deemed stable for discharge on October 5, 2018 and returned to the group home with small cuts to the back of his head.

Following this incident, Decedent was documented to have increased refusal of food, coughing episodes, and significant weight loss. His condition was explained to his brother on or about December 31, 2018, and his brother consented to a PEG tube placement on January 3, 2019. Decedent had a GI appointment on January 8, 2019, and an esophagogastroduodenoscopy with possible PEG placement was scheduled for February 21, 2019.

Before the scheduled GI follow-up, Decedent was transferred from the group home to Mount Sinai Brooklyn emergency room on January 28, 2019 with fever and dehydration. He weighed 81 pounds at that time, having lost approximately 20 pounds from his baseline weight. He was diagnosed with sepsis secondary to aspiration pneumonia. A PEG placement was considered but could not be performed on February 5, due to his elevated fever. He passed away on February 10, 2019.

Plaintiff alleges that the employees and staff at the Adapt group home departed from the standard of care in their treatment of Decedent following his October 2018 fall, and they failed to timely address his neurological symptoms, worsened dysphagia, and malnutrition. Plaintiff further alleges that these departures from the standard of care were a proximate cause of his worsened condition and death.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing

2

either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure" (*Rosenzweig v Hadpawat,* 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (*Martinez v Orange Regional Med. Ctr.,* 203 AD3d 910, 912 [2d Dept 2022]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (*Rosenzweig,* at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023]).

In support of their motion for summary judgment, Defendant submits an expert affirmation from Alan Z. Segal, M.D. ("Dr. Segal"), a licensed physician board certified in neurology, vascular neurology, and neuro-critical care.

Dr. Segal's affirmation focuses primarily on the alleged link between Decedent's October 4, 2018 fall and the worsening of his dysphagia. He opines that Adapt, through its agents and employees, did not depart from the standard of care in evaluating Decedent for a potential traumatic brain injury. He notes that after his fall, he was transferred to Brookdale Hospital emergency department and received CT scans which were "unremarkable" and "showed no acute intercranial abnormality or hemorrhage." He opines that Decedent had no abnormalities or clinical symptoms which warranted further MRI study, such as "severe pain, tenderness, or swelling to the head-neck, abnormal or fixed eye gaze, change/slur in speech, acute paralysis, excessive uncontrollable bleeding, bruising, discoloration, or suspicious or actual change in the resident's neurological, cognitive or mental status." He opines that Adapt complied with the standard of care and relied on the hospital's evaluation that he was stable for discharge.

3

[* 3]

He further opines that the Adapt staff complied with the standard of care in the days following his discharge from Brookdale Hospital by administering Bacitracin, checking his vital signs two times per day, and monitoring Decedent's neurological status, and they documented he had no convulsions, seizures, or change in behavior.

Dr. Segal opines that Decedent's worsening dysphagia, dehydration, weight loss, and pneumonia leading to his January 28, 2019 hospitalization and death were not proximately caused by the October 4, 2018 fall. He opines that there is no evidence from his "normal" CT scans on October 5, 2018 that he sustained "acute ischemia or blockage to the brain which would have affected his ability to swallow and maintain nutritional sustenance." He states that Decedent's oropharyngeal dysphagia was a preexisting condition since 2013, and "any change in this condition was not in any way secondary to any alleged brain injury," because there was no evidence of injury in his CT scans and "no change in his functioning and baseline" immediately after the fall.

Defendant also submits an expert affirmation from Arnon Lambroza, M.D. ("Dr. Lambroza"), a licensed physician board certified in internal medicine and gastroenterology.

Dr. Lambroza states that Decedent's dysphagia was a chronic, irreversible, and degenerative disease and that it was "not an acute medical condition that required in-patient hospital treatment absent a choking episode or related event where the patient had developed increased difficulty in swallowing." He opines that Adapt "responded appropriately" to isolated choking episodes prior to October 2018 and transferred Decedent to a hospital. He also states that Decedent's family was appropriately "made aware" of his condition and "chose not to give consent for the placement of a gastric tube until 2019."

Dr. Lambroza opines that Adapt's speech pathologist and nutritionist appropriately monitored changes to Decedent's diet, that he was routinely followed by a gastroenterologist, and there was "no worsening in his dysphagia baseline after the fall." He opines that his nutrition and hydration were being "appropriately monitored and supervised" by his care team at Adapt, including weekly weight checks and the addition of high-

4

calorie Boost supplement in December. He also opines that he was referred to the GI clinic at Maimonides "at appropriate intervals" after his fall in October 2018 and in response to his weight loss in January 2019.

Dr. Lambroza acknowledges that lab work taken on October 19, 2018 was "suggestive of dehydration and weight loss," but opines that this is a common progression for patients with "longstanding oropharyngeal dysphagia" and that "there was nothing further that could be done" for Decedent prior to his family's consent for a feeding tube, which he suggests was continuously "refused" until January 2019.

Dr. Lambroza further opines that Adapt appropriately referred Decedent to the GI physician on January 8, 2019, and there was "no indication or reason" for an evaluation before that date, since that physician had recommended a "continued conservative approach" on his last appointment on October 11, 2018. He opines that on January 28, 2019, Decedent was appropriately transferred for emergency treatment at Mount Sinai in response to his fever, and prior to that time there were no "suspicious signs or symptoms of acute illness that warranted emergency transfer to the hospital for testing and treatment," such as "episodes of choking or related flair-ups."

On the issue of proximate causation, Dr. Lambroza opines that Decedent's oropharyngeal dysphagia was a progressively worsening condition "over the course of many years" that was not exacerbated by the October 4, 2018 fall or any "delay in proper medical treatment" by Adapt. He opines that this type of dysphagia is commonly associated with Treacher-Collins Syndrome, and he had a long-documented history of difficulty swallowing prior to October 2018. He also opines that placement of a gastric tube would not have cured or "eliminated his health risks" of aspiration pneumonia, as this treatment still carries a risk of such infections.

Based on these submissions, the movants have not established prima facie entitlement to summary judgment. They primarily opine on the issue of whether Adapt properly treated Decedent's head injury and evaluated him for potential neurological symptoms, concluding that he did *not* suffer a traumatic brain injury which exacerbated his existing health condition. However, they fail to adequately address Plaintiff's claims related to Decedent's worsening oropharyngeal dysphagia and alleged delay in proper medical treatment from

5

[* 5]

October 2018 until his transfer to the hospital on January 28, 2019. Specifically, the claims asserted in Plaintiff's bill of particulars include but are not limited to:

"failing to conduct nursing and/or medical assessment/examinations of the decedent with sufficient frequency between October 5, 2018 and January 28, 2019, despite an apparent decline in the decedent's condition including decline in swallow ability and nutrition status; . . . in failing to adequately address and/or treat decedent's malnutrition and/or dehydration; in failing to ensure that decedent's nutrition and hydration were being properly managed; in failing to ensure the decedent was receiving adequate nutrition and hydration; in failing to ensure that decedent maintained acceptable parameters of nutritional status, such as body weight, protein and albumin levels, and received an appropriate therapeutic diet when a nutritional problem was evident; in failing to ensure that the decedent was receiving a diet that met his daily nutritional and special dietary needs; . . . in failing to properly track the decedent's weight between October 5, 2018 and January 28, 2019; in failing to properly monitor the decedent's nutritional and hydration status; in failing to diligently seek and/or timely request consent for PEG tube placement from decedent's brother after a decline in swallow function/exacerbation of oropharyngeal dysphagia/decline in foot and fluid intake was apparent following the fall incident of October 4, 2018; in failing to timely effectuate PEG tube placement; in failing to ensure and/or effectuate prompt PEG tube placement after obtaining consent for such placement from decedent's brother on or about January 3, 2019; . . . in failing to properly feed decedent, in accordance with his plan of care."

Contrary to the movants' argument in reply, the management of Decedent's nutrition and hydration are not issues improperly raised by Plaintiff for the first time in opposition. The allegations related to Decedent's malnutrition from October 5, 2018 through January 28, 2019 were clearly noticed in the bill of particulars, and it is the burden of the movant to eliminate issues of fact on these claims, regardless of the sufficiency of the opposing papers.

To the extent the movants' gastroenterology expert addresses these issues, he states that Adapt was meeting Decedent's nutritional needs with supplements and weekly weight checks. This expert's statement that he had "no worsening in his dysphagia baseline after the fall" is flatly contradicted by the medical records and nursing notes, which demonstrate his rapid weight loss and increased difficulty eating in the months leading up

6

[* 6]

to his January 28, 2019 hospitalization. The expert also states there were no acute "episodes of choking or related flair-ups" which warranted referral to the hospital or GI clinic prior to January 2019. Again, this is controverted by their own records, where Decedent was repeatedly noted to have increased episodes of choking, coughing, and food refusal from October to December. The movants' experts repeatedly suggest that Decedent's treatment was impacted by his family's "refusal" to consent to a PEG feeding tube, but they cite only to a decision made five years earlier when his condition was relatively stable, and there is no record of any discussion or attempt to obtain consent between that time and December 31, 2018. Thus, these opinions are conclusory and unsupported by the record.

The experts' opinions on proximate causation are also speculative and conclusory. They opine generally as to the preexisting, gradual, and "progressive" nature of Decedent's illness, but cite to no evidence of a progressive decline prior to October 31, 2018, when the marked change in his condition and his weight loss begin to appear in the record and nursing notes. Notably, Decedent's treatment records from July 2017, February 2018, and April 2018 reflected that he had "excellent tolerance of his oral diet" and was stable at a baseline weight of 102-105 pounds for over one year. The fact he had a dysphagia condition prior to the treatment and care at issue is insufficient to establish prima facie that condition was not *exacerbated* by the fall itself and/or by the alleged medical malpractice and delay in proper interventions and treatment. The proffered opinions on liability and proximate causation are therefore speculative, conclusory, and wholly unsupported by the evidence in the record.

Notwithstanding the movants' failure to meet their prima facie burden, Plaintiff submits an expert affirmation in opposition from Allan Hausknecht, M.D. ("Dr. Hausknecht"), a licensed physician board certified in neurology.

Dr. Hausknecht opines that Decedent did suffer a mild traumatic brain injury on October 4, 2018 which "caused a substantial and rapid worsening of his baseline dysphagia." He states that exacerbation of preexisting

7

[* 7]

dysphagia is a known complication of mild traumatic brain injury, due to the disruption of signals from the brain controlling mouth and throat muscles.

He acknowledges that the CT scans Decedent underwent at Brookdale Hospital after his fall did not show large-scale bleeding or abnormalities, but he opines that this type of study is not reliable in identifying "smaller, microscopic brain injuries like concussions, small bleed, or nerve injuries" as the result of head trauma. Thus, he opines that the CT scans did not rule out that the fall he suffered on October 4, 2018 resulted in a brain injury. While the CT scan may not have warranted further imaging on its own, he opines that *when there is a change in a patient's neurological status* following head trauma, additional diagnostic studies such as an MRI are required by the standard of care.

He further opines that for a patient like Decedent "who was unable to adequately communicate" due to his intellectual disabilities, Adapt had a responsibility in compliance with the standard of care to observe his clinical symptoms and changes in neurological status following the event. Specifically, he opines that the standard of care required Adapt to refer Decedent to a neurologist for assessment and MRI of the brain. He counters the movants' expert opinions that there was "no evidence" of change in his neurological status, opining that his "increased difficulties with swallowing, coughing while eating, and mood change" were neurological symptoms that required further assessment and referral. Despite the documented changes in his condition, Dr. Hausknecht opines that no such interventions were taken.

Dr. Hausknecht also opines that dysphagia increases the risk of aspiration choking and pneumonia, due to food and liquid entering the lungs instead of the esophagus. Therefore, he opines the alleged brain injury, worsened dysphagia, and delayed and inadequate medical treatment were a proximate cause of his January 2019 illness and death.

Plaintiff also submits an expert affirmation from Maxwell M. Chait, M.D. ("Dr. Chait"), a licensed physician board certified in internal medicine and gastroenterology.

8

[* 8]

Dr. Chait opines that based on the record, Decedent's baseline dysphagia and overall health "substantially deteriorated" after the October 2018 fall, with increased incidents of coughing, choking, and refusing food. He notes that prior incidents of choking, which resulted in Decedent being temporarily transferred to a hospital, were "attributed to his tendency to speak while eating" rather than a significant worsening or progression of his dysphagia. He cites to nursing notes and evaluations from July 2017, February 2018, and April 2018 which reflected Decedent's baseline dysphagia and weight were stable.

Dr. Chait notes that beginning on October 31, 2018, there were documented notes of recent weight loss, "increased cough at feeding time," and refusing meals. His weight was recorded at 91 pounds on December 16, 2018, with "significant weight loss of 7 lb in 2 weeks" according to the nurse practitioner's notes. His care plan at that time was updated with "encouragement to eat," "weekly weight monitoring," and GI consultation. Dr. Chait opines that this assessment and plan was a clear departure from the standard of care, as Decedent had signs of "starvation and severe malnourishment" which were not being addressed, and he should have been transferred to a hospital "for urgent alternative modes of nutrition" including PEG tube placement.

When Decedent was evaluated by his Adapt nutritionist and speech language pathologist on December 27, 2018, Dr. Chait notes that he was kept on the same oral diet "with addition of Boost high calorie supplements." He opines this was beneath the standard of care to address his dysphagia and refusal of food, as it consisted of another orally-given liquid. He further opines there was no specified intervention to ensure his hydration needs were being met.

Dr. Chait opines that the Adapt providers departed from the standard of care by delaying until January 3, 2019 to speak with Decedent's brother and obtain consent for PEG tube placement, and further delaying until January 28, 2019 to transfer Decedent to Mount Sinai for emergency treatment. He notes that Mount Sinai was advised by Adapt nurses that he had been unable to eat "in the past few months" and that they "could not take Decedent back" without PEG tube placement. Dr. Chait opines that the decision to transfer him to the hospital

9

[* 9]

should have been made in December when he was clinically malnourished, and it was documented that they could not provide him with nutrition by mouth.

Dr. Chait renders no opinion on whether a brain injury caused the worsening of Decedent's dysphagia, as it is outside his specialty, (an opinion stated by Plaintiff's neurology expert), but he opines that the obvious deterioration of that condition from October 4, 2018 to January 28, 2019 was "not adequately and timely managed" by Adapt. He opines that Adapt's alleged departure from the standard of care – failing to timely intervene and transfer Decedent to a hospital or other facility to receive a higher level of care – was a proximate cause in his development of aspiration pneumonia, sepsis, and death. Dr. Chait opines that if he had been transferred to a hospital or nursing home, then even before receiving a PEG tube, he could have been provided a temporary nasogastric tube and IV nutrients and fluids, which "would have substantially reduced his risk of developing aspiration pneumonia," an infection that occurs from food or liquid entering the lungs while choking. He therefore opines that Decedent's development of the lung infection was directly linked to his inadequately treated dysphagia. He opines his ability to recover from the infection was also "substantially reduced due to his severe malnourishment, dehydration, and the septic condition brought on by his starvation," and thus the alleged delay in receiving proper medical treatment was a proximate cause of his injuries and death.

Additionally, Plaintiff submits an affirmation from Mitchell Kirk Holliday, a dietician with a Master of Science degree in food and nutritional science and a doctorate in education. Holliday renders opinions consistent with Dr. Chait, stating that Decedent's nutrition, hydration, and rapid weight loss was not properly treated. He notes that weight loss of over 7.5% body weight over three months or 5% over one month, as seen in Decedent's weight checks, is considered "severely malnourished." He further opines that Decedent's infection and sepsis were significantly worsened by severe malnutrition and dehydration, which hindered his ability to recover.

10

Even if the movants had established prima facie entitlement to summary judgment, Plaintiff's submissions raise clear issues of fact as to the standard of care and proximate causation. Plaintiff submits a conflicting opinion from a neurologist as to whether Decedent's worsened dysphagia and death were proximately caused by head trauma. Separate from that issue, Plaintiff raises issues of fact as to whether Adapt departed from the standard of care in treating Decedent's worsened dysphagia from October 2018-January 2019, adequately providing nutrition and hydration, and timely referring him to a hospital or specialists for a higher level of care. There remain issues of fact on all these claims which require resolution of a jury, and summary judgment is therefore **denied.**

Accordingly, it is hereby:

**ORDERED** that United Cerebral Palsy of New York City, Inc. d/b/a Adapt Community Network's motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all medical malpractice claims against them in this action, is **DENIED.**

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

11

[* 11]